1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   SALVADOR MENDOZA,                    )    1:09-CV-00732 AWI JMD HC
                                         )
10              Petitioner,              )    FINDINGS AND RECOMMENDATION
                                         )    REGARDING PETITION FOR WRIT OF
11      v.                               )    HABEAS CORPUS
                                         )
12   KELLY HARRINGTON,                   )
                                         )
13              Respondent.              )    THIRTY (30) DAY DEADLINE TO
    _____)    OBJECTIONS

14

15         Salvador Mendoza ("Petitioner") is a state prisoner proceeding *pro se* with a petition for writ

16   of habeas corpus pursuant to 28 U.S.C. § 2254.

17                           **PROCEDURAL HISTORY**

18         Petitioner is currently in the custody of the California Department of Corrections and

19   Rehabilitation pursuant to a July 13, 2004, jury verdict finding Petitioner and his two co-defendants

20   (Francisco Garcia and Henry Santana) guilty of the first degree murder of Roberto Ramirez (Cal.

21   Penal Code § 187).  The jury found true special allegations relating to the murder charges, namely

22   that the defendants committed the crime during the commission of kidnaping and torture.  The jury

23   further convicted the three defendants on corresponding charges of torture (Cal. Penal Code § 206),

24   conspiracy (Cal. Penal Code § 182), and kidnaping (Cal. Penal Code § 207(a)).  The trial court

25   sentenced Petitioner to life without the possibility of parole.

26         Petitioner appealed his conviction to the California Court of Appeal, Fifth Appellate District,

27   which issued a reasoned opinion on October 19, 2007, affirming Petitioner's conviction.  (*See* Resp't

28   Answer Ex. A; Lod Docs. 1, 9.)

1      Petitioner filed a petition for review with the California Supreme Court on November 20,

2  2007.  (Lod. Doc. 10.)  The California Supreme Court denied the petition on January 30, 2008.

3  (Lod. Doc. 11.)

4      On April 23, 2009, Petitioner filed the instant federal petition for writ of habeas corpus.

5      On December 23, 2009, Respondent filed an answer to the petition, to which Petitioner filed

6  a traverse on February 22, 2010.

7                            **FACTUAL BACKGROUND**[1]

8      At approximately 6:30 p.m. on October 1, 2002, Isabel Valdes, a farm laborer
   living at a labor camp with about a dozen other people, observed a group of five men
9  enter the camp carrying a total of two handguns and a rifle. Those present in the camp
   were moved outside and ordered face down on the ground. They were told they would
10  be killed if they did not get down on the ground. The group asked for Roberto and
   Julian. Roberto Ramirez (the victim herein) said "here I am." Two men took the
11  victim away. During the encounter two other people were hit across the head with a
   handgun. The entire incident took about 10 minutes. Valdes could not describe the
12  men. Valdes testified that the men left in a four-door green vehicle. Valdes recognized
   exhibit 103 (a rifle seized from Eulalio Mendoza, a.k.a. Pelon) as looking like one of
13  the weapons he saw that evening. The people at the camp did not call the police
   because they were afraid.
14
      Scott Rufer, an abuser of drugs, rented a house in Merced. His home was a
15  place where various people would come to use drugs. David Medina (David) slept on
   the couch in the house and his brother, Ramon Medina (Ramon), was an occasional
16  overnight guest.

17      On October 1, 2002, at 8 or 9 p.m., David and Rufer were watching television
   in Rufer's house when a car pulled up in the driveway. David walked to the front door
18  when the car arrived. Rufer testified that five people got out of the car and one of
   them had a pillowcase over his head. The other four men escorted the victim to one of
19  the back bedrooms.

20      Rufer testified that, when the group entered his home, David spoke to them in
   Spanish and then told Rufer to sit on the couch, not to move, not to look, and not to
21  breathe. David was armed and unplugged all of the telephones. Ramon arrived after
   the group of men arrived. Ramon was armed with a shotgun or rifle.
22
      The group stayed in the back room approximately 20 to 25 minutes. The men
23  came out of the back room occasionally during this time. David told Rufer that the
   victim was a snitch.
24
      An old gray four-door car pulled up and the men left with the victim. Rufer
25

26  ───────────────

27  [1]These facts are derived from the California Court of Appeal's opinion issued on October 19, 2007.  (*See* Resp't
   Answer Ex. A.)  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state
   court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence. 28 U.S.C. §
28  2254(e)(1); *see Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Moses v. Payne*, 555 F.3d 742, 746 n. 1 (9th Cir.
   2009).

and David remained at the house.

Rufer had no idea until months later of what happened to the victim. Rufer identified Eulalio Mendoza (a.k.a. Pelon[2]) as one of the four men who arrived with the victim. Pelon was a friend of the Medina brothers (David and Ramon). Rufer identified Garcia from a photo lineup on February 2003 as one of the men who was in the group that arrived with the victim. Rufer picked out Santana on the day he testified as one of the people in the group of men who accompanied the victim into Rufer's house. On cross-examination, Rufer said he saw Santana that evening but he was not positive if Santana was with the group. Rufer recognized Mendoza but was not sure if he was at his house with the group of men.

David was originally charged with murder. He entered a plea to false imprisonment and served six months in jail. He testified for the prosecution. David was living with Rufer in October of 2002. On October 1, 2002, he saw car lights. Three men walked into the house. One of the men had his head covered with a shirt or some other material. The other two men were armed. David did not know what was happening. David was told to stand by the door and not let anyone in the house. He did as he was told. The men went into the bedroom and remained there for 20 to 30 minutes. David's brother Ramon was there. The men came out of the room, a car pulled up, and the group got in the car and left. David did not know if Ramon ever went into the room where the men were with the victim. David recognized Garcia as one of the men who was with the victim. In addition, he testified that Pelon was the other man who accompanied the victim into the house.

Ramon was also charged with murder but pleaded guilty to false imprisonment and kidnapping. He received a jail term for his convictions. Ramon testified that he was staying at Rufer's house in October of 2002. Pelon was at the house earlier in the day on October 1, 2002, acting weird and nervous. Later in the day Pelon, Garcia, Mendoza, and Santana arrived at the house in a gray car (pictured in People's exhibit 15). They arrived with the victim. The victim was bleeding.

Ramon testified that the four men escorted the victim to the back room. They all had weapons, including a rifle and handguns. Santana and Mendoza left. Pelon came out and demanded that Ramon go in the back room. He complied. Ramon saw Pelon kicking the victim in the stomach, ribs, and back. Garcia pistol-whipped the victim on the forehead. Garcia asked the victim questions, including questions about "Queenie" and asked him where certain people were. Pelon and Garcia yelled at the victim. The victim was crying and hurting. He had tears and blood coming down his face. The victim asked them to quit.

Pelon went to the kitchen while Ramon and Garcia remained in the room with the victim. Ramon was sitting in a chair holding the rifle that Pelon handed to him. Ramon held the gun because Pelon demanded that he hold it.[3] Pelon had a handgun in his other hand. Pelon, Garcia, and the victim were in the back room between 45 minutes to an hour. Ramon testified that he was only in the room for 25 minutes. The victim was curled up on the bed.

The same car that was used to bring the victim to the house was used to take

---

[2]We will refer to Eulalio Mendoza as Pelon in order to distinguish him from defendant Mendoza.

[3]Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon.

the victim away. The victim was led out of the house with his face covered with a shirt. Ramon testified that the car belonged to Mendoza. Pelon told those remaining in the house to clean up. They did.

On cross-examination by Santana's attorney, Ramon was asked if he knew Sylvia Brown. He said he had "smoked dope" with her. He was asked if he had told Sylvia Brown that he had set up Santana. Ramon denied saying that to Sylvia Brown.

Maria Bustos (a.k.a. Lupe) lived in a room with her boyfriend at Rufer's home. On October 1, 2002, Rufer, Ramon, David, Pelon, and Bustos were present at the home. According to Bustos, Pelon seemed desperate, as if he was waiting for something. Four men arrived in a four-door car. The men pulled a person out of the car with his eyes covered by clothing. Pelon and Garcia took the victim into the house. The other two men remained outside and left. Garcia had a gun and was holding on to the victim. Ramon had a gun.

Bustos was told to go outside. She did. The men remained in the house for 30 to 60 minutes. The victim was then led outside by Garcia, David and Ramon. Pelon remained inside and called Bustos inside. Once inside Pelon told Bustos to clean up the blood. When the victim was brought inside he was wearing sandals and socks. When he left he was only wearing socks. Ramon kept the victim's sandals.

Merced Irrigation District employees were spraying the canal banks on October 4, 2002, when they saw something floating in the water. They determined that the object was a human body and called law enforcement.

Deputy Sheriff Gerald Dover arrived at the scene. The body was removed from the water. The arms of a shirt had been wrapped around the victim's neck and tied. Five expended shell casings were found on the canal bank. There were shoe impressions in the dirt.

Dr. James Wilkerson conducted an autopsy on the victim, Roberto Ramirez. A black Ramon was shown a weapon at trial and asked if it was the weapon he was holding. He said yes. The record does not reflect the exhibit number of the weapon or the type of weapon that was shown to Ramon. shirt was tied around the victim's neck. It appeared that the shirt had been worn as a hood. The victim had suffered six gunshot wounds. One wound began at the upper chest, another one to the chest, another to the lower chest, one through the arm, one to the left buttocks, and the final gunshot wound was to the upper left thigh. The wounds were excessive for the purpose of killing someone. The cause of death was multiple gunshot wounds.

In addition to the gunshot wounds, the victim had blunt force injuries to his face and groin. The victim had a laceration to the bridge of his nose and a cut above his left eye. He had bilateral injuries to his groin with the bruise on one side of the groin larger and more purple than the other side. These wounds were inflicted before the victim was shot. The bruises were large and characterized as severe. The doctor testified that it would take significant force to cause the bruising. It appeared from the size of the bruises that the victim was unaware that he was going to receive the blows to his groin. A groin injury is probably the most painful injury a man can receive. The victim suffered at least two blows to his groin.

The victim had alcohol and methamphetamine in his system when he died. Four expended bullets were removed from the victim during the autopsy.

On October 11, 2002 Oakland police officer Allen Miller found a car in an

apartment building parking lot in a high crime area. The car was dusty and had been sitting there awhile. The car was returned to Merced County.

Mario Naranjo said he sold the car on May 9, 2002 to two people, Mendoza and his brother Fortino Mendoza. The payments were brought in each month. Sometimes the payments were made by defendant Mendoza, sometimes by Fortino.

The car was searched and checked for fingerprints. Blood was found in the car. Latent print analyst Richard Kinney processed the vehicle. He lifted 22 print cards. Mendoza's fingerprints were on a can of Red Bull found in the car and a container of Prestone interior cleaner. Garcia's prints were found on the inside passenger rear window as well as on a cognac bottle. The fingerprint analyst was only asked to compare the prints of four people (Garcia, Mendoza, Santana, and Pelon) to the prints taken from the car and its contents.

Eight stains inside the car were tested for blood and were positive. Two of the stains were then tested for a DNA profile. The profile of the blood stains matched the victim's and would occur in one in 630 billion Hispanics. DNA on cigarette butts taken from the car matched Mendoza.

Isais Fierros knows the three defendants. Mendoza is Fierros's cousin, he is related to Santana, and he knows Garcia. On October 5, 2002 Fierros went to the Atwater Police Department to report a matter he had telephoned about on October 3 and 4. He told the police that Garcia had tried to take his child and that Mendoza had called him and demanded that he provide him with $50,000. Fierros told the police that Mendoza said he had killed someone in Merced and needed the money to get out of town. Fierros laughed when Mendoza said he was going to kill him. Fierros said that when Mendoza called him the next day and repeated the demand, he took him more seriously. Fierros did not go to the police until "they" attempted to take his child.

Fierros left the police department after making his report. Later that day, Fierros called 911 because Mendoza was following him and he was afraid. Mendoza was taken into custody. Officers found a loaded firearm under the passenger seat of the car he had been driving.

Fierros talked to Mendoza at the direction of the police department. When Fierros asked Mendoza what he had done in Merced, Mendoza replied, "That's nothing." Fierros told Detective Dover that Garcia mentioned that "they" had killed someone. Fierros agreed to wear a wire for the police and talk to Garcia. Fierros asked Garcia if the guns had been disposed of. Garcia said "they had thrown them away."

On cross-examination, Fierros began to change his story. He said that Mendoza wanted the money for Pelon's bail. He testified that he made up stories for the police because he was concerned about his child and he wanted to get Garcia and Mendoza off the street. When he first called the police to tell them that someone had tried to take his child, the officer told him he was not a babysitter and he should make his report in person. Fierros was angry enough with Garcia to tell lies about him and to kill him. Fierros wanted Garcia arrested and off the streets. Fierros told police that Mendoza's car might be found in Oakland, but Fierros did not drive the car there. Fierros testified that Garcia did not confess a murder to him, but perhaps he (Fierros) gave that impression to the police because he needed the police to get Garcia locked up. Fierros testified that Mendoza never asked him for money because of a murder. Fierros was angry with Mendoza and wanted him off the streets. Fierros said he was telling the truth now in court.

On redirect examination, Fierros starting repeating the version of events he told on cross-examination. He testified that Mendoza did call him and ask him for money but Mendoza did not say he was going to kill Fierros nor did Mendoza tell Fierros he had killed a man in Merced. Fierros made up a lot of things he told police with the purpose of getting Mendoza and Garcia off the streets.[4]

Atwater police officer Aaron McKnight testified that he met Fierros in the lobby of the police station at 9:35 a.m. on October 5, 2002. Fierros had called the police department on October 3d, and October 4th. Fierros told Officer McKnight that Mendoza had called him and wanted $50,000 because he had killed a guy and he needed to flee. Fierros told McKnight that Mendoza said he would kill him if he did not come up with the money. Fierros was afraid of Mendoza and also afraid of Garcia because Garcia associated with Mendoza and Fierros thought Garcia was looking for him to do him harm.

Sergio Torres lived in Merced in October of 2002. He knew Garcia and Mendoza from Mexico and met Santana in the United States. Garcia called Torres before October 11, 2002, and asked him to come to his hotel and to bring beer and food. Torres went to the hotel room. Torres was accompanied by his girlfriend, and Garcia's girlfriend was also present. Torres and Garcia drank beer and consumed methamphetamine. When the women went to the store, Garcia told Torres that he, Mendoza, Santana, and Pelon had kidnapped a man, took the man to a house in Merced, and then took the man outside Merced to a canal bank. Mendoza made the victim sit on the canal bank. Garcia told Torres that Mendoza shot the man first and Garcia shot him after Mendoza shot him. Garcia was not sure if he hit the man with his shot. After the victim was shot he fell into the water. Garcia told Torres that they used Mendoza's car.

Garcia told Torres that when they were driving back from the canal they let Santana out of the car because he was scared and did not want to be with them anymore.

Torres testified that he has a methamphetamine problem and has been in trouble with the law. At the time he testified he had three cases pending. Torres's attorney went to law enforcement and said Torres had information he would provide in exchange for a better disposition. Torres talked to law enforcement about what Garcia told him with the hope that he would get help with his own legal problems. He reached an agreement with the prosecution. Charges pending against him were reduced and he was also given help to move away.

On cross-examination Torres disclosed more details about his deals with the prosecution. He was arrested on May 25, 2001 with a pound of methamphetamine. He reached a plea agreement in April of 2002. He pled guilty to possession of methamphetamine with the agreement that he would receive no more than 16 months in prison. Between the time of his plea and before sentencing Torres was cooperating with law enforcement to bring them information in the hopes that his sentence would

---

[4]At this point in the proceeding, and in front of the jury, the prosecutor asked for permission to question Fierros with leading questions because he was now a hostile witness. Counsel for Garcia stated that perhaps counsel should be appointed for Fierros. The prosecutor responded that he thought counsel should be appointed, "because this is getting into perjury territory." He repeated his concern about perjury. A discussion was held in chambers. Fierros said he did not wish to answer any more questions on Fifth Amendment grounds, "otherwise I could get in trouble." The court told the jury that Fierros had exercised his Fifth Amendment right and was not going to testify anymore. The discontinuation of Fierros's testimony and the issues surrounding it will be discussed under part V.

be less than 16 months. His case was continued in July and August. Torres kept asking for more time to gather information. He had not found any information to pass on to law enforcement in October of 2002.

On February 5, 2003, Torres finally came forward with the information he had received from Garcia in October of 2002. In May of 2003 Torres agreed to testify in Garcia's case. In the interim, Torres was arrested in March of 2003 for possession of a handgun. He testified at Garcia's preliminary hearing and was released from jail that day. His new felony charges were reduced to misdemeanors and he received a promise of financial assistance to relocate. He was arrested again in June and August of 2003 and during the current trial in June and July of 2004. He had five cases pending. His cases had been continued with the hope that he would get favorable treatment from the district attorney's office. Torres testified that he came forth with his story regarding Garcia in February of 2003 because Garcia and the other defendants were in jail and he felt safe.

On February 26, 2003 all three defendants were in custody and scheduled for a court appearance. They were transported in a van that had been outfitted with several recording devices. Garcia and Mendoza were placed in the van first. Santana joined them several minutes later.

A tape of the recording was played to the jurors. In the tape Mendoza asked Garcia what he knew and who was talking. Garcia said they are taking fingerprints of everyone who was in the car. Garcia told Mendoza that he told police that they are cousins and sometimes Mendoza would give him a ride to the store. Garcia also said that the police were asking if he knew Pelon and Santana. Mendoza suggested that they say that they do not know anything. Garcia said that is what he has already told them. Mendoza said they should get a lawyer for whomever they find the most fingerprints for. Garcia reported to Mendoza that Rudy and "Queen" (Fierros) were talking and that Santana "is doing well with him [Fierros]." Garcia and Mendoza discussed guns. Garcia said the police got a gun from him and had the gun found in Mendoza's possession. Garcia told Mendoza the police said they had proof who did it and Garcia asked to see the proof.

Garcia continued the conversation and asked why they should pay when they had not done anything. He accompanied this comment with laughter. Santana entered the van. Santana reported to the other two that the "old man" and Ms. Lupe are the ones who were saying everything. Garcia said it's not the old man, it is Ms. Lupe, Santana's pal Rudy and "Tupu" (Torres).

Santana asked where Pelon was. Garcia and Mendoza responded they did not know. Santana suggested they call his "lady" to find him. Garcia said he already knew. Santana suggested that Pelon "could tie those dummies." Garcia said they could not do anything now or they would dig their hole deeper.

The three discussed how cases would go if there was not any evidence. Mendoza asked what was up with "Quini" [Fierros' nickname was Queenie]. Garcia said he did not know where he was. Santana said that "Quini" said he was not going to say anything. Santana said "they" saw Juan, "you guys" [Mendoza and Garcia], and Pelon. Garcia said he told them he would go there for crack. Occasionally throughout the conversations they indicated that they had not done anything.

The three then discovered the listening devices. Garcia said they did not do anything. Mendoza said they should look for the person who did "that." Garcia said they have us here and the person who did it is out. Santana said they don't have any

evidence but they are putting it in the paper so they can come and see who did it. Garcia said they aren't going to find evidence because they weren't the ones who did it.

When Ramon Medina testified, he was asked on cross-examination if he had told Sylvia Brown (Sylvia) that he had set up Santana. Ramon replied that he had not. Based on this cross-examination, the district attorney's office investigated calls made by Sylvia's husband, John Brown (John). John was a cellmate of Santana's in jail. This investigation resulted in Sylvia's testifying at trial.

John and Santana were housed in the same cell in the jail. John was allowed to leave jail for one week on a pass. He returned to jail on May 23, 2004 and continued to share a cell with Santana until his removal on June 22, 2004. John's removal from Santana's cell occurred during the trial in this case.

Sylvia testified that when John was out of jail on a one week pass he told her that Santana wanted her to keep Ramon from testifying. Before the plan was put into action, Ramon had already testified. Santana changed his plan and wanted Sylvia to lie and say that Ramon had set Santana up. John and Sylvia were under the belief that they would be paid for doing this.

Sylvia told Santana's investigator that she saw Ramon, and Ramon told her that he had set up the three defendants. When Santana's defense counsel disclosed this information to the district attorney, the district attorney began an investigation.

Sylvia was interviewed by Detective Dover. In her first interview she lied and stuck to her original story that she had seen Ramon. In her second interview with Dover, he confronted her with the tapes of the conversations among Sylvia, John, and Santana in jail. Sylvia then said the story about Ramon was a lie. Sylvia agreed to testify for the prosecution in exchange for a two-year suspended sentence for conspiracy to commit perjury. Santana and John were the alleged coconspirators.

The tape of the telephone conversation among Sylvia, John, and Santana was played for the jury. The telephone call began between Sylvia and John. John told Sylvia that Ramon had already testified, so if Sylvia wanted to come forward and say that Ramon was lying that would be good. Sylvia asked questions of John, and John asked Sylvia if she wanted to talk to Santana. She said yes, and John summoned Santana to the telephone. Sylvia and Santana spoke in Spanish. Sylvia explained to Santana that she knew him from before and that she is John's wife. Sylvia told Santana that if he needed her to go to court she would go. He said yes. Santana said he was there because of Ramon and La Bomba (Torres). Santana said, "That their [ sic ] telling lies." Sylvia said whatever you need me to do, I'll do. Santana said that if Sylvia did "us" that favor, he would greatly appreciate it. Santana said he already told "him" of the appreciation that he was going to give her. Santana wanted Sylvia's name and address so he could give it to his attorney. Sylvia told Santana that John could provide him all of her details. Santana told Sylvia that when his attorney talks to her she should tell him that the guy told pure lies and that is why he was hiding. Santana also asked Sylvia to look for other girls who know that "they" are liars to come and testify. Santana said he would get in agreement with Sylvia's husband and he appreciated what Sylvia was doing.

Sylvia then spoke to John and told him to give Santana her name and address so he could send his lawyer over. She also said she would get other people to back him up.

1

2

3

The parties stipulated that the bullets recovered from the victim were fired from the same weapon. It was also stipulated that the weapon used to kill the victim was not the gun seized from Garcia when he was arrested, it was not the gun seized from Mendoza when he was arrested, nor was the murder weapon Pelon's rifle. In addition, the ammunition seized from Santana's home on February 14, 2003, pursuant to a search of his house, was not associated with the death of the victim.

4

5

6

7

Garcia was arrested at a restaurant. Garcia struggled when he was arrested and had a gun in his waistband of his pants. Garcia got his hand on one of the officer's service weapons during the struggle. The struggle was described as a life or death struggle, lasting three to four minutes and requiring five people to take Garcia into custody.

(Resp't Answer Ex. A at 2-14.)

8

## DISCUSSION

9

### I.   Jurisdiction

10

11

12

13

14

15

16

17

18

19

20

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  Petitioner is currently incarcerated at Kern Valley State Prison in Kern County  and  Petitioner's custody arose from a conviction in the Merced County Superior Court.  As both Merced and Kern County falls within this judicial district, 28 U.S.C. § 84(b), the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  *See* 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a state court convicted and sentenced the petitioner if the state "contains two or more Federal judicial districts").

21

### II.   ADEPA Standard of Review

22

23

24

25

26

27

28

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment.  *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *overruled on other grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The instant petition was filed in 2008 and is consequently governed by the provisions

1   of the AEDPA.  *See Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).  Thus, the petition "may be granted

2   only if [Petitioner] demonstrates that the state court decision denying relief was 'contrary to, or

3   involved an unreasonable application of, clearly established Federal law, as determined by the

4   Supreme Court of the United States.'"  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007) (quoting 28

5   U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

6          Title 28 of the United States Code, section 2254 remains the exclusive vehicle for

7   Petitioner's habeas petition as Petitioner is in custody of the California Department of Corrections

8   and Rehabilitation pursuant to a state court judgment.  *See Sass v. California Board of Prison Terms*,

9   461 F.3d 1123, 1126-1127 (9th Cir. 2006)  *overruled in part on other grounds*, *Hayward v.*

10  *Marshall*, 2010 WL 1664977,*19 (9th Cir. 2010) (en banc).  As a threshold matter, this Court must

11  "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court

12  of the United States.'"  *Lockyer*, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining

13  what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the

14  dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  *Id*.

15  (quoting *Williams*, 592 U.S. at 412).  "In other words, 'clearly established Federal law' under §

16  2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time

17  the state court renders its decision."  *Id*.  Finally, this Court must consider whether the state court's

18  decision was "contrary to, or involved an unreasonable application of, clearly established Federal

19  law."  *Lockyer*, 538 U.S. at 72, (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a

20  federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that

21  reached by [the Supreme] Court on a question of law or if the state court decides a case differently

22  than [the] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413; *see*

23  *also Lockyer*, 538 U.S. at 72. "Under the 'unreasonable application clause,' a federal habeas court

24  may grant the writ if the state court identifies the correct governing legal principle from [the] Court's

25  decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529

26  U.S. at 413.  "[A] federal court may not issue the writ simply because the court concludes in its

27  independent judgment that the relevant state court decision applied clearly established federal law

28  erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.  A federal

1   habeas court making the "unreasonable application" inquiry should ask whether the State court's

2   application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

3       Petitioner bears the burden of establishing that the state court's decision is contrary to or

4   involved an unreasonable application of United States Supreme Court precedent. *Baylor v. Estelle*,

5   94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

6   Circuit precedent remains relevant persuasive authority in determining whether a state court decision

7   is objectively unreasonable. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003) ("While *only* the

8   Supreme Court's precedents are binding on the Arizona court, and only those precedents need be

9   reasonably applied, we may look for guidance to circuit precedents"); *Duhaime v. Ducharme*, 200

10  F.3d 597, 600-601 (9th Cir. 1999) ("because of the 1996 AEDPA amendments, it can no longer

11  reverse a state court decision merely because that decision conflicts with Ninth Circuit precedent on

12  a federal Constitutional issue....This does not mean that Ninth Circuit caselaw is never relevant to a

13  habeas case after AEDPA. Our cases may be persuasive authority for purposes of determining

14  whether a particular state court decision is an "unreasonable application" of Supreme Court law, and

15  also may help us determine what law is "clearly established"). Furthermore, the AEDPA requires

16  that the Court give considerable deference to state court decisions. The state court's factual findings

17  are presumed correct. 28 U.S.C. § 2254(e)(1). A federal habeas court is bound by a state's

18  interpretation of its own laws. *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

19      The initial step in applying AEDPA's standards requires a federal habeas court to "identify

20  the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091

21  (9th Cir. 2005). Where more than one State court has adjudicated Petitioner's claims, the Court

22  analyzes the last reasoned decision. *Id*. (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) for the

23  presumption that later unexplained orders, upholding a judgment or rejecting the same claim, rests

24  upon the same ground as the prior order). Thus, a federal habeas court looks through ambiguous or

25  unexplained state court decisions to the last reasoned decision in order to determine whether that

26  decision was contrary to or an unreasonable application of clearly established federal law. *Bailey v.*

27  *Rae*, 339 F.3d 1107, 1112-1113 (9th Cir. 2003). Here, the California Court of Appeal and the

28  California Supreme Court were the only courts to have adjudicated Petitioner's claims. As the

California Supreme Court summarily denied Petitioner's claims, the Court looks through those decisions to the last reasoned decision; namely, that of the California Court of Appeal. *See Ylst v. Nunnemaker*, 501 U.S. at 804.

**III.    Review of Petitioner's Claims**

The petition for writ of habeas corpus sets forth four grounds for relief.  In his first ground for relief, Petitioner contends that the admission of a non-testifying co-defendant's statements violated Petitioner's Confrontation Clause rights.  Petitioner's second ground for relief alleges that his due process rights were violated by the trial court's denial of his severance motion.  Additionally, Petitioner contends his constitutional rights were violated by the trial court's issuance of an erroneous jury instruction.  Lastly, Petitioner alleges that his Sixth Amendment right to counsel was violated by counsel's absence from a jury instruction conference.

**1.    *Ground One: Confrontation Clause***

In his first ground for relief, Petitioner alleges that the admission of co-defendant Garcia's out of court statements to witness Torres violated his Confrontation Clause rights.

The Confrontation Clause protects a defendant from unreliable hearsay evidence being presented against him during trial.  *See* U.S. Const. Amend. VI.  The Confrontation Clause of the Sixth Amendment specifically provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Id*.  The Sixth Amendment's Confrontation Clause was made applicable to the states through the Due Process Clause of the Fourteenth Amendment.  *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2531 (2009) (citing *Pointer v. Texas*, 380 U.S. 400, 403 (1965)).  The admission of a non-testifying co-defendant's hearsay confession violates a defendant's rights under the Confrontation Clause when that statement facially, expressly, clearly, or powerfully implicates the defendant.  *See Bruton v. United States*, 391 U.S. 123, 135-136 (1968); *Richardson v. Marsh*, 481 U.S. 200, 208 (1987) (limiting *Bruton* to statements that are incriminating on their face or expressly incriminating since statements that only become incriminating when linked with other evidence are inherently less prejudicial); *see also Mason v. Yarborough*, 447 F.3d 693, 695 (9th Cir. 2006) ( "*Bruton* specifically exempts a statement, not incriminating on its face, that implicates the defendant only in connection to other admitted

1    evidence"). In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the United States Supreme Court

2    held that the protections of the Confrontation Clause apply only to testimonial statements. The

3    *Crawford* court observed that, "[w]here testimonial statements are involved, we do not think the

4    Framers meant to leave the Sixth Amendment's protections to the vagaries of the rules of evidence,

5    much less to amorphous notions of 'reliability.'" *Id*. at 61. The *Crawford* court thus found that the

6    Confrontation Clause bars the introduction of out-of-court statements which are testimonial in

7    nature, unless "the declarant is unavailable, and only where the defendant has had a prior opportunity

8    to cross-examine." *Id*. at 59.

9         Petitioner argues that the admission of Torres' testimony regarding Garcia's statements

10   violated Petitioner's rights under *Crawford* as the statements were testimonial in nature. Petitioner

11   relies on Torres' status as a police informant at the time of the conversation between Garcia and

12   Torres occurred. The California Court of Appeal rejected this argument, finding the statements

13   were non-testimonial and therefore did not implicate Petitioner's Confrontation Clause rights. The

14   Court does not find this holding to be an objectively unreasonable application of *Crawford*.[5]

15        The Court does not find Torres' status as a government information is dispositive towards

16   determining the testimonial nature of the statements. The Supreme Court in *Davis* characterized

17   "statements made unwittingly to a Government informant" as "clearly nontestimonial." *Davis*, 547

18   U.S. at 826 (citing *Bourjaily v. United States*, 483 U.S. 171, 181-84 (1987)); *see United States v.*

19   *Saget*, 377 F.3d 223, 228-30 (2d Cir. 2004) (holding that "a declarant's statements to a confidential

20   informant, whose true status is unknown to the declarant, do not constitute testimony within the

21   meaning of *Crawford*"). Here, the Court agrees with the California Court of Appeal that the

22   statements are non testimonial as "[t]he statement of Garcia to Torres did not occur under

23   circumstances that had earmarks of solemnity and purpose characteristic of testimony. Defendants'

24

25        [5]As the appellate court found the statements were not-testimonial, the California Court of Appeal did not address
26   the claim that the statements implicated Petitioner's Confrontation Clause rights under *Bruton*. Even if the Court found that
     *Bruton* protects non-testimonial statements, a *Bruton* error claim, like any other Confrontation Clause claim, is subject to
27   harmless error analysis. *Lilly v. Virginia*, 527 U.S. 116, 139-40 (1999) (plurality opinion); *United States v. Bowman*, 215
     F.3d 951, 961-62 (9th Cir. 2000) (holding that Confrontation Clause violation, if any, was harmless beyond a reasonable
28   doubt, as there was other evidence linking defendant to the conspiracy beyond a reasonable doubt). For the reasons set forth
     above, the Court finds that the admission of such evidence was harmless in light of the plethora of evidence against Petitioner.

1   argument shows only a mere chance that the statement might be used at trial."  (Resp't Answer Ex. A

2   at 34.)   As the Supreme Court in *Davis* observed, the statement "are testimonial when the

3   circumstances objectively indicate that there is no such ongoing emergency, and that the primary

4   purpose of the interrogation is to establish or prove past events potentially relevant to later criminal

5   prosecution."  *Davis*, 547 U.S. at 822.  Here, it is obvious that the primary purpose of Garcia and

6   Torres' conversation, which occurred after Garcia asked Torres to bring him food and meet him at

7   his hotel room, was not for use in a later criminal prosecution.  Thus, the Court does not find that the

8   appellate court's decision was an objectively unreasonable application of Supreme Court precedent.

9          Assuming *arguendo* that the statements were testimonial and Petitioner's Confrontation

10   Clause rights were violated, the Court finds the violation was harmless error.  *See Delaware v. Van*

11   *Arsdall*, 475 U.S. 673, 680 (1986) (Confrontation Clause violations subject to harmless error

12   analysis).  To obtain habeas corpus relief, Petitioner must demonstrate that the error "'had substantial

13   and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abramson*, 507 U.S.

14   619, 637-38 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In light of the

15   overwhelming evidence of Petitioner's guilt, Petitioner has not demonstrated that the admission of

16   Garcia's statements to Torres had a substantial and injurious effect on the jury's verdict.  The

17   plethora of evidence against Petitioner included: a car that had been bought by Petitioner, and which

18   Petitioner made payments on, was identified as the vehicle used to transport the victim during the

19   events in question; blood stains in the car matched the victim's;  Petitioner's fingerprints along with

20   Petitioner's DNA on a cigarette bud were found in the car;  Ramon Medina testified that all of the

21   defendants showed up at the house with the bleeding victim; and Petitioner's cousin told police that

22   Petitioner demanded $50,000 from him and that Petitioner told him the money was needed because

23   Petitioner had just killed a man in Merced and was in trouble.  Consequently, the Court finds that

24   Petitioner is not entitled to habeas corpus relief on this ground.

25   \\\

26   \\\

27   \\\

28   \\\

1          **2.     Ground Two: Severance**

2          In his second ground for relief, Petitioner contends that his right to due process of the law

3   was violated by the trial court's denial of his severance motion.

4          A court may grant habeas relief based on the state court's denial of a motion for severance

5   only if the joint trial was so prejudicial that it denied the petitioner his right to a fair trial.  *See Zafiro*

6   *v. United States*, 506 U.S. 534, 538-539 (1993) (court must decide if "there is a serious risk that a

7   joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from

8   making a reliable judgment about guilt or innocence"); *United States v. Lane*, 474 U.S. 438, 446 n. 8

9   (1986) ("misjoinder would rise to the level of a constitutional violation only if it results in prejudice

10  so great as to deny a defendant his Fifth Amendment right to a fair trial"); *Featherstone v. Estelle*,

11  948 F.2d 1497, 1503 (9th Cir.1991) (same).  To prevail on a habeas claim based on a trial court's

12  refusal to sever the petitioner's trial from his co-defendant, petitioner "bears the burden of

13  demonstrating that the state court's denial of his severance motion rendered his trial fundamentally

14  unfair," *see Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997), and must establish that prejudice

15  arising from the failure to sever was so "clear, manifest, and undue" that he was denied a fair trial.

16  *see Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir.1999) (quoting *United States v.*

17  *Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir.1996)).   A trial is rendered fundamentally unfair "if

18  the impermissible joinder had a substantial and injurious effect or influence in determining the jury's

19  verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

20         On habeas review, federal courts neither depend "on the state law governing severance in

21  state trials" nor "consider procedural rights afforded in federal trials."  *Grisby*, 130 F.3d at 370

22  (citing *Hollins v. Dep't of Corrections, State of Iowa*, 969 F.2d 606, 608 (8th Cir. 1992)).  Instead,

23  the relevant question is whether the State court's decision not to sever the trial violated Petitioner's

24  due process rights.  *Grisby*, 130 F.3d at 370; *see Featherstone*, 948 F.2d at 1503 ("simultaneous trial

25  of more than one offense must actually render petitioner's state trial fundamentally unfair and hence,

26  violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate") (internal

27  quotation marks and citation omitted).  There is a preference for joint trials of defendants who are

28  indicted together, unless mutually antagonistic or irreconcilable defenses may be so prejudicial as to

1  mandate severance. *See Zafiro*, 506 U.S. at 538.  Severance should be granted only if there is a

2  "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or

3  prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539.

4      Here, there is no allegation that there were mutually antagonistic and irreconcilable defenses

5  such that "acceptance of the co defendant's theory by the jury precludes acquittal of the defendant."[6]

6  *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996); *see also Cooper v. McGrath*,

7  314 F.Supp.2d 967, 983 (N.D. Cal. 2004).  Rather, Petitioner argues that the severance motion

8  should have been granted because of the alleged prejudice stemming from Sylvia Brown's testimony

9  that co-defendant Santana bribed her to commit perjury.  The California Court of Appeal rejected

10  this argument, finding that no prejudice resulted from the trial court's failure to sever the trial.

11  (Resp't Answer Ex. A at 51.)  The appellate court's decision rested on the jury instructions which

12  clearly instructed the jury that they could not use the evidence of Santana's dealings with Brown

13  against either Petitioner or Garcia.  The appellate court noted that the contents of Sylvia Brown's

14  testimony's was not so prejudicial that the jurors ignored the trial court's admonitions.  Additionally,

15  the appellate court finding that there was no prejudice relied on the substantial evidence of

16  Petitioner's guilt.

17      The Court does not find this decision to be an objectively unreasonable application of

18  Supreme Court precedent.   Any prejudice to Petitioner that might have resulted from the

19  introduction of Sylvia Brown's testimony was dissipated by the trial court's instruction to the jury

20  that they could only consider the testimony of Sylvia Brown against Santana.  In fact the trial court

21  emphasized this, admonishing the jury that "[t]here's going to be testimony here from Ms. Brown

22  and accompanied by a recording which, as you already know, will be played in court and you will be

23  provided transcripts. *This testimony is limited, to be considered against Mr. Santana only.  Mr.*

24  *Santana.  Not to be considered against Mr. Garcia or Mr. Mendoza*."  (RT at 2254) (emphasis

25  added).  The jury was instructed again just prior to closing argument that "[e]vidence has been

26  _____

27      [6]The Ninth Circuit in *Collins v. Runnels*, 603 F.3d 1127, 1132-33 (9th Cir. 2010) recently clarified that for AEDPA purposes, "neither *Zafiro v. United States* nor *United States v. Lane* establish a constitutional standard binding on the states

28  requiring severance in cases where defendants present mutually antagonistic defenses."  Thus, even if the defenses were antagonistic, Petitioner would not be entitled to habeas corpus relief.

omitted against one of more of the defendants, and not admitted against the others.  ¶  At the time this evidence was admitted you were instructed that it could not be considered by you against the other defendants.  ¶ Do not consider this evidence against the other defendants."  (RT at 2654.)  As the presumption exists that jurors followed the trial court's instruction, *see Fields v. Brown*, 503 F.3d 755, 781 (9th Cir. 2007) (citing *Richardson v. Marsh*, 481 U.S. 200, 206,(1987)), the Court must presume that the jurors did not consider the evidence relating to the bribery and perjury of Sylvia Brown against anyone other than Santana.  Thus, the Court does not find that the severance motion deprived Petitioner of a fundamentally fair trial and Petitioner is not entitled to habeas corpus relief on this ground.

Similarly, the Court agrees with the appellate court's conclusion that Petitioner cannot establish that he was prejudiced by the denial of the severance motion in light of the abundance of independent evidence establishing Petitioner's guilt that had been admitted prior to Sylvia Brown's testimony.  (Resp't Answer Ex. A at 50.)  Thus, the Court finds that the California Court of Appeal's decision was reasonable because the abundance of independent evidence and the trial court's instructions weigh heavily against a finding that the denial of the severance motion had "a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval*, 241 F.3d at 772. Therefore, Petitioner is not entitled to habeas corpus relief on this ground.

### 3.   Ground Three: Defective Jury Instruction

The petition's third ground for relief alleges that Petitioner's due process rights were violated by the trial court's erroneous instruction on the special circumstance of torture.  Specifically, Petitioner contends that the trial court failed to instruct the jury that each defendant is required to have the specific intent to torture in order to find the special circumstance of torture.  Petitioner argues the instructions permitted the jury to find the special circumstance true if only one defendant possessed the specific intent.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the error so infected the entire trial that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973) in finding that a habeas court must not merely consider

whether an "instruction is undesirable, erroneous, or even universally condemned" but must instead

determine "'whether the ailing instruction by itself so infected the entire trial that the resulting

conviction violates due process'"); *see also Waddington v. Sarausad*, 129 S.Ct. 823, 832 (2009)

(noting that the pertinent question is whether the ailing instruction by itself so infected the entire trial

that the resulting conviction violates due process").  An erroneous jury instruction "directed toward

an element of the offense may rise to the level of a constitutional defect." *Byrd v. Lewis*, 566 F.3d

855, 862 (9th Cir. 2009) (citing *Neder v. United States*, 527 U.S. 1, 9-10 (1999)).  "Due process

requires that jury instructions in criminal trials give effect to the prosecutor's burden of proving

every element of the crime charged beyond a reasonable doubt. [Citation] 'Nonetheless, not every

ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process

violation.'" *Townsend v. Knowles*, 562 F.3d 1200, 1209 (9th Cir. 2009) (quoting *Middleton v.

McNeil*, 541 U.S. 433, 437 (2004) (per curiam)).   Additionally, "[t]he jury instruction may not be

judged in artificial isolation, but must be considered in the context of the instructions as a whole and

the trial record." *Id.* (citation and internal quotation marks omitted).  "If the charge as a whole is

ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the

challenged instruction in a way that violates the Constitution." *Middleton*, 541 U.S. at 437.

The California Court of Appeal agreed with Petitioner's reading of the jury instruction but

found that the error was harmless, stating, "[w]e agree that the instruction was erroneous as to all

three defendants but find that any error was harmless."  (Resp't Answer Ex. A at .)  The appellate

court elaborated that:

> In addition to the torture murder special circumstance, each defendant was also
> convicted separately of the substantive crime of torture. The instructions for torture
> stated that "[e]very person who, with the intent to cause cruel or extreme pain and
> suffering for the purpose of revenge, extortion, persuasion, or for any sadistic
> purpose, inflicts great bodily injury upon the person of another, is guilty of the crime
> of torture." The intent required for the torture murder special circumstance is the same
> intent required for the crime of torture. ( *People v. Elliot* (2005) 37 Cal.4th 453, 479.)
> Thus, the jury necessarily found the defendants possessed the requisite intent through
> other properly given instructions. ( *People v. Adams* (2004) 124 Cal.App.4th 1486,
> 1495.)

(Resp't Answer Ex. A at 64-65.)

\\\

1    The California Court of Appeal's decision was not an objectively unreasonable application of

2    Supreme Court precedent.  In light of Petitioner's conviction on the substantive offense of torture,

3    the Court finds the erroneous jury instruction on the special circumstance of torture was harmless as

4    the jury obviously found Petitioner himself possessed the requisite intent.  Petitioner argues that the

5    substantive torture instruction is distinct enough that a conviction on the substantive offense does not

6    necessitate a jury finding of specific intent required for the special circumstance.  In support of this

7    argument, Petitioner notes that wording of the substantive instruction states that a defendant must

8    intend to cause "cruel or extreme pain and suffering."  (Pet. at 31) (quoting Cal. Penal Code § 206 an

9    CALJIC No. 9.90).  Petitioner argues this is significantly distinct from the requirement that a

10   defendant "intended to inflict extreme cruel physical pain" as required for a finding of the special

11   circumstance.  The California Court of Appeal rejected this argument, observing that "the

12   instructions as given to the jury did not make a distinction between mental and physical pain and

13   thus when they found the intent for the torture, they necessarily found the intent for the special

14   circumstance."  (Resp't Answer Ex. A at 64, n.12.)

15       After reviewing the jury charge, the Court agrees with the California Court of Appeal's

16   finding that the jury necessarily found that Petitioner had the specific intent required for the special

17   circumstance as they found Petitioner guilty of the substantive crime of torture.  Consequently, the

18   Court finds that Petitioner is not entitled to habeas corpus relief.

19       **4.    _Ground Four: Sixth Amendment Right to Counsel_**

20       In his last ground for relief, Petitioner alleges that he was denied his Sixth Amendment right

21   to counsel when trial counsel failed to attend a conference on jury instructions.

22       The California Court of Appeal summarized the factual basis of the claim, noting that:

23           At the close of testimony on July 1, 2004, the court stated that it would meet
           with the parties' counsel in chambers the following day to discuss jury instructions.
24       The following day, this chambers conference took place with all parties represented.
           The conference was not transcribed, but the clerk's transcript states this was the only
25       business carried on by the court on this day.
             On Tuesday, July 6, court was convened outside the presence of the jury. The
26       court stated, "We were going to take up some requests for special injury [ sic ]
           instructions." The court discussed special instructions proposed by Santana. After
27       some discussion, the court noted on the record that counsel for Mendoza was not
           present and he had given authority to the two other defense attorneys to appear for the
28       purpose of arguing these special instructions. The court then discussed Mendoza's

objections to transcripts of tapes and said Mendoza's counsel had said he would research the issue and present something to the court if he came up with anything. The court rejected an instruction proposed by the People that would have been detrimental to the defendants.

The following morning the court ruled with regard to one of the proposed special instructions offered by Santana. The court also gave Mendoza's counsel an opportunity to place anything on the record regarding the transcript issue. Mendoza's counsel had nothing further to add. The court also remarked it had deleted something from one of the instructions and that the People had withdrawn an instruction.

(Resp't Answer Ex. A at 66-67.)

Petitioner argues that his constitutional rights were violated because he was deprived of counsel at a critical stage. The California Court of Appeal rejected this argument, stating:

"The Sixth Amendment secures to a defendant who faces incarceration the right to counsel at all 'critical stages' of the criminal process. [Citations.]" ( *Iowa v. Tovar* (2004) 541 U.S. 77, 87.) We need not determine if the jury instruction conference is a critical stage of the proceeding to determine if Mendoza was deprived of counsel at a critical stage of the proceedings here. Mendoza's counsel was present during the jury instruction conference. He was not present during the jury instruction conference affecting the "special" instructions raised by Santana. Because this was a conference relating particularly to Santana, it was not a critical stage for Mendoza. The record does not establish that this was a critical stage of the proceedings from Mendoza's standpoint because it was not a time where crucial decisions affecting his case were to be made and there is nothing in the record to show that counsel's presence at this "special" conference would have protected and furthered Mendoza's substantial rights.

Furthermore, counsel for Mendoza was present during the normal jury instruction conference, and he was brought up to speed the following day by the court and allowed to make any comments he found necessary. (*See People v. Morris* (1991) 53 Cal.3d 152, 210.)

Mendoza argues that his counsel could have argued that the court should instruct that Ramon Medina was an accomplice as a matter of law, but his absence precluded him from doing so. As previously discussed, the court did not err in not instructing that Ramon was an accomplice as a matter of law.

(Id. at 67-68.)

The Court does not find this to be an objectively unreasonable application of Supreme Court precedent. In felony cases, a criminal defendant is entitled to be represented by counsel at all critical stages of the prosecution. *See Mempa v. Rhay*, 389 U.S. 128, 134-37 (1967); *United States v. Cronic*, 466 U.S. 648, 653 (1984). A criminal defendant need not demonstrate prejudice to obtain relief where it has been found that he was deprived of counsel at a critical stage. *Musladin v. Lamarque*, 555 F.3d 830, 836-38 (9th Cir. 2009). "A critical stage is any 'stage of a criminal proceeding where substantial rights of a criminal accused may be affected.'" *Hovey v. Ayers*, 458 F.3d 892, 901 (9th Cir. 2006) (quoting *Mempa*, 389 U.S. at 134). Thus, a critical stage is generally

where there is a risk that counsel's absence might result in prejudice to the defendant and undermine

the defendant's right to a fair trial.  *See United States v. Wade*, 388 U.S. 218, 228 (1967); *see also*

*Beaty v. Stewart*, 303 F.3d 975, 991-92 (9th Cir. 2002) (finding that a critical stage requiring the

presence of counsel is a trial-like confrontation in which potential substantial prejudice might arise to

the defendant's interest and where counsel's presence may help avoid that prejudice).  The Ninth

Circuit has articulated factors to consider in determining whether the proceeding was a critical stage,

stating that:

> On the basis of Supreme Court precedent, principally *Mempa* and *United States v. Ash*, 413 U.S. 300, 309, 313, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), we have distilled a three-factor test for determining what constitutes a critical stage. We consider whether: (1) "failure to pursue strategies or remedies results in a loss of significant rights," (2) "skilled counsel would be useful in helping the accused understand the legal confrontation," and (3) "the proceeding tests the merits of the accused's case." *Menefield v. Borg*, 881 F.2d 696, 698-99 (9th Cir.1989). The presence of any one of these factors may be sufficient to render a stage of the proceedings "critical." *Cf.* Ash, 413 U.S. at 313, 93 S.Ct. 2568 (noting that the relevant inquiry is "whether the accused require[s] aid in coping with legal problems or assistance in meeting his adversary") (emphasis added)).

*Hovey*, 458 F.3d at 901-02.

Petitioner has not demonstrated that these three factors would support a finding that the

conference discussing proposed jury instructions by co-defendant Santana was a critical stage

requiring the presence of counsel.  Petitioner alleges that counsel's presence at this conference

resulted in a failure to pursue a jury instruction regarding Ramon Medina's status as an accomplice.

The Court rejects this argument as it was the failure to pursue this strategy at the original jury

instruction conference and at subsequent jury instruction discussions, for which counsel was present,

that resulted in the absence of this instruction.  The second factor weighs against finding that this

was a critical stage as Petitioner was not present at the proceeding; thus, obviating the need for

counsel's assistance in helping Petitioner understand the proceedings.  The third factor similarly

compels a finding that this was not a critical stage for Petitioner as it does not in any way test the

merits of Petitioner case.  In sum, the Court finds that this conference was not a critical stage that

would require the presence of counsel.  *See United states v. Benford*, 574 F.3d 1228, 1232 (9th Cir.

2009) (pre-trial status conference was not a "critical stage" of the trial).  Thus, the absence of counsel

was not a violation of Petitioner's constitutional rights and Petitioner is not entitled to habeas corpus

1  relief on this basis.

2  **RECOMMENDATION**

3  Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

4  DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

5  Respondent.

6  This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United

7  States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of

8  the Local Rules of Practice for the United States District Court, Eastern District of California.

9  Within thirty (30) days after being served with a copy, any party may file written objections with the

10  court and serve a copy on all parties.  Such a document should be captioned "Objections to

11  Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

12  filed within ten (10) *court* days (plus three days if served by mail) after service of the objections.

13  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

14  parties are advised that failure to file objections within the specified time may waive the right to

15  appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

16  IT IS SO ORDERED.

17  **Dated:    October 22, 2010**            **/s/ John M. Dixon**
                                           UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28